

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-15-262

|  |  |
|---|---|
| ANGELA STOUT ERSKIN<br>APPELLANT<br><br>V.<br><br>MARVIN STOUT<br>APPELLEE | **Opinion Delivered** September 30, 2015<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[No. DR-13-134]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

### LARRY D. VAUGHT, Judge

Appellant Angela Stout Erskin appeals the order entered by the Washington County Circuit Court denying her motions for modification of custody, visitation, and child support; denying her motion for contempt of court; and awarding attorney's fees to appellee Marvin Stout. On appeal, she contends that the trial court clearly erred in finding that a material change in circumstances had not occurred and that modification of custody was not in the best interest of the parties' son, J.S. (born April 18, 2004). Erskin also argues that the trial court erred in finding that Stout was not in contempt and in awarding attorney's fees. We affirm.

After the parties were divorced, the trial court entered an order on October 24, 2013, denying a motion for change of custody previously filed by Erskin. This order gave Stout custody of J.S. and Erskin visitation. This order also required Stout to immediately effectuate any paperwork required to allow Erskin access to J.S.'s medical and educational information.

On June 19, 2014, Erskin moved for modification of custody, alleging that on March 18, 2014, J.S. pulled his permanent tooth by gnawing on his bed frame. She also alleged that on June 15, 2014, J.S. "chewed his bottom lip off." Erskin asserted that Stout failed to provide medical/dental treatment after these incidents and that Stout failed to show concern for J.S.'s health or fully understand his medical condition. She alleged that J.S. was in danger and requested that she be awarded custody of him. Erskin later filed an amended motion alleging that the incidents of J.S.'s self-mutilation constituted a material change in circumstances sufficient to support a modification of custody, visitation, and child support. She also filed a motion for contempt, claiming that Stout failed to comply with the trial court's order to effectuate paperwork so that she had access to J.S.'s medical information.

An emergency hearing was held on the issue of temporary custody of J.S. on July 8, 2014. Erskin testified that Stout told her that in March 2014, J.S. pulled one of his permanent teeth after he gnawed on his bed frame. In June 2014, she said that J.S. chewed the inside of his lip. She said that she found out about J.S.'s lip from Stout's mother (J.S.'s grandmother), who called and asked Erskin to take him for treatment, which Erskin did at Northwest Medical Hospital. Erskin testified that she was displeased with J.S.'s treatment there. Erskin testified that later that same day, Stout took J.S. to Washington Regional Hospital, and J.S. was referred to Vantage Point for mental-health treatment, where he was admitted and stayed for eight weeks. Erskin stated that Stout failed to put her on the emergency-contact list at Vantage Point and that she did not have access to his medical records and care there. However, she also said that she was present when J.S. was admitted to Vantage Point, she visited him every Sunday during his stay,

and she received two passes that permitted her to remove J.S. from the facility. She claimed that Stout was disinterested in J.S.'s care and that he would receive better care in her custody.

Stout testified that he admitted J.S. to Vantage Point as soon as he was referred there. Stout said that he participated in family-counseling sessions. He also testified that he provided Vantage Point with Erskin's contact information but that her name was not on the admission paperwork.

At the conclusion of the hearing, the trial court found that there was no emergency warranting a change of custody pending the full hearing on custody. The court found that both Erskin and Stout were involved in J.S.'s treatment, Stout did not fail to provide medical treatment to J.S., and Stout was not preventing Erskin from being involved in J.S.'s care. The court further found that there was no evidence Stout was going to take J.S. out of Vantage Point or that he had taken J.S. out on a pass and not returned him. An order was entered July 23, 2014, wherein the trial court found that there was "not enough evidence to show there is an emergency that warrants modifying temporary custody of the minor child." Stout was ordered to add Erskin as a primary contact to J.S.'s medical-contact lists.

On November 10, 2014, the trial court appointed an attorney ad litem on behalf of J.S., and the modification-of-custody hearing was held on November 20, 2014. Faith Berry, J.S.'s counselor at Vantage Point, testified that J.S. had suicidal and homicidal ideations and that his self-mutilating behavior was due to stress. J.S. told Berry that he was "distressed" because his parents were fighting over him. Berry said that both parents denied talking to J.S. about the custody case. However, when Berry asked J.S. how he knew about the custody case, he said that

his mom had been "working on" him "to try and say I want to live at her house." He said that he knew that was what she wanted, but he wanted to live at both houses. When Berry asked J.S. if his dad ever talked to him about the custody case, J.S. said, "no, but sometimes I wish he would say what he wants me to do because I don't know what to do and they're fighting over me." He added, "they've never really fought about it in front of me, but that's what I feel like. I feel like I'm in the middle, and there is like these two battles going on all around me." J.S. also told Berry that sometimes at night he did not feel safe at Erskin's house, although he could not explain why. For these reasons, Berry said that she had concerns with Erskin having custody of J.S. and that, in her opinion, extended time with Erskin would be detrimental to J.S.'s mental health.

Berry stated that Stout attended all counseling sessions, had a positive disposition, and complied with the treatment team's recommendations. Berry testified that she had no concerns with Stout having custody of J.S. Berry stated that Erskin attended some counseling sessions and also complied with the treatment team's recommendations. However, Berry added that during one family session Erskin objected to discussing how the custody case was affecting J.S.'s stress level.

Erskin testified that while she was aware of J.S.'s admission to Vantage Point and attended some of his counseling sessions there, she stated that she was not advised of all of the counseling sessions or when J.S. was released. She added that she did not have Medicaid or ARKids insurance cards for J.S. and that she had been unable to make medical appointments

for him.[1] Erskin testified that Stout did not understand J.S.'s condition but that she had a "total understanding of it" because she has the same ADHD diagnosis.

Stout testified that J.S. was doing well in his home. He stated that he did not know that J.S. pulled his tooth until his school called about it. And he had not taken J.S. to the dentist after he pulled the tooth because it was too late. After the lip injury, Stout said that he and his wife, Malisa, took J.S. to Washington Regional Hospital for a second opinion and treatment. The next day, they checked J.S. into Vantage Point.

Malisa Stout testified that she and Stout had taken J.S. to the doctor a week-and-a-half after he pulled his tooth and that Stout asked the doctor for a psychological evaluation, but the doctor did not do it. She said that she gave Erskin a copy of J.S.'s Vantage Point discharge papers. Malisa also told the court that Stout's sister (J.S.'s aunt) was murdered in May 2014, that J.S. heard about it in the news, and that he was very upset about it.

J.S.'s attorney ad litem reported to the court that J.S. said that he wanted to live with his mother. The attorney ad litem also said that it was not normal for a ten-year-old boy to pull a permanent tooth. He believed that J.S. was stressed due to the custody case and his aunt's murder, and despite the fact that he was in counseling, he was not improving. The attorney ad litem had concerns about both parents, but he thought a temporary change of custody might be beneficial for J.S., along with continued counseling and treatment.

At the conclusion of the hearing, the trial court noted that this was the second time in one-and-a-half years that Erskin had filed for a change of custody. The court found that J.S. had

---

[1]Colleen Martin, Erskin's sister, testified that she had seen her sister try, unsuccessfully, to make medical appointments for J.S.

SLIP OPINION

mental-health issues, and the custody battle and the gruesome and highly publicized murder of his aunt were affecting him. The court took the matter under advisement.

On December 3, 2014, the trial court entered an order finding that Erskin failed to meet her burden of showing a substantial change of circumstances to warrant a change of custody. The court found that J.S.'s needs were being met by Stout; Stout obtained proper mental-health treatment for J.S.; Stout handled each stage of the medical and psychological problems appropriately; J.S. disclosed to Berry that he felt distressed at Erskin's home and that on one occasion felt less safe there; Berry did not have concerns with custody remaining with Stout; that the custody battle needed to end or J.S. would suffer emotional damage; and that it was not in J.S.'s best interest for custody to be modified. The trial court also found that Erskin failed to prove that Stout was in contempt. And finally, the trial court awarded Stout $2000 in attorney's fees. This appeal followed.

We have recited the standard of review in child-custody cases:

> Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. A judicial award of custody will not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the circuit court or were not known by the circuit court at the time the original custody order was entered. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. The reasons for requiring these more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues. The party seeking modification has the burden of showing a material change in circumstances.

*Harris v. Harris*, 2010 Ark. App. 160, at 13–14, 379 S.W.3d 8, 15–16 (citing *Hatfield v. Miller*, 2009 Ark. App. 832, at 7, 373 S.W.3d at 366, 371). We consider the evidence de novo, but the trial

court's findings of fact will not be reversed unless they are clearly erroneous or clearly against the preponderance of the evidence. *Harris*, 2010 Ark. App. 160, at 14, 379 S.W.3d at 16. We give due deference to the superior position of the trial court to view and judge credibility of the witnesses, a deference even greater in cases involving child custody, where the trial judge has a heavy burden to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*, 379 S.W.3d at 16.

Erskin's first point on appeal is that the trial court clearly erred when it found there was no material change of circumstances sufficient to warrant a modification of custody and that modification was not in the best interest of J.S. She points out that the attorney ad litem suggested that a temporary change of custody might benefit J.S., and she notes that J.S.'s stated preference was to live with her. She also argues that Stout failed to notice that J.S. pulled his permanent tooth, failed to provide proper medical care for J.S. after he pulled his tooth and after he chewed the inside of his lip, and failed to tend to J.S.'s declining mental health. She claims that Stout "abdicated his parental responsibilities" like the father in *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009);[2] in *Stehle*, our court reversed the trial court's denial of the mother's motion to modify custody, holding that the trial court's finding was clearly erroneous.

Erskin is confused about *Stehle*. Our court, in an unpublished opinion, *Stehle v. Zimmerebner*, CA 07-810, 2008 WL 2122820 (2008), reversed the trial court's finding that the mother failed to prove a material change of circumstances and held that custody should have been vested in the mother. However, our decision was reversed by the supreme court in *Stehle*

---

[2]In *Stehle*, there was evidence presented that the father delegated his parental responsibilities to his daughter's paternal grandparents and former stepmother.

*v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). There, the supreme court held that the trial court's finding, denying the mother's motion to modify custody, was not clearly erroneous. The supreme court pointed to the trial court's finding that while some circumstances had changed for the parties (the father moved frequently with his daughter, he divorced his daughter's stepmother after a physical altercation, and the mother improved her financial situation) and both parties needed improvement, the child was doing well in the father's custody. The supreme court also highlighted the trial court's familiarity with the parties and its superior ability to assess their credibility. *Id.* at 456–57, 291 S.W.3d at 580–81.

Contrary to Erskin's argument, our supreme court's holding in *Stehle* actually supports the trial court's decision to deny her motion to modify custody. As in *Stehle*, the trial court herein acknowledged that some circumstances had changed since the last custody hearing. J.S. was suffering from mental-health issues, which were manifested in two incidents of self-mutilation. However, similar to *Stehle*, the trial court made findings that are supported by the evidence. The trial court, with its familiarity with the parties and its superior ability to assess their credibility, found that the evidence demonstrated that Stout obtained the proper mental-health treatment for J.S. and that the custody cases brought by Erskin were causing him to suffer extreme stress and anxiety. The trial court also found that Erskin's testimony that she and J.S. share the same condition and that she understood what he was going through, implied that Stout did not and could not, which could alienate J.S. from Stout and cause additional stress. The trial court also found that a change of custody was not in J.S.'s best interest. The trial court cited Berry's testimony that she had concerns with Erskin having custody because J.S. had disclosed that he

8

SLIP OPINION

felt distressed about being the center of the custody dispute, Erskin had talked with him about the custody case, and she had tried to convince him to live with her. J.S. also disclosed to Berry that he was stressed at Erskin's home and on one occasion felt unsafe there. Berry did not have concerns with custody remaining with Stout. The trial court found the testimony of Berry credible, stating that she was concerned with the well-being of J.S. Ultimately, the trial court found that the "custody battles"[3] must end or J.S. would suffer emotional damage.

Erskin claims that the trial court gave "an abundance of weight" to the testimony of Berry, but counters that she was biased against Erskin.[4] She argues that it "is hard to understand why the trial court would hinge its ruling of the best interest of the child on the therapist's testimony when her testimony was so hostile, evasive, and obviously biased against the mother." This is a challenge to Berry's credibility. As set forth above, when the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial court to evaluate the witnesses, their testimony, and the child's best interest. *Stehle*, 375 Ark. at 456, 291 S.W.3d at 581; *Harris*, 2010 Ark. App. 160, at 14, 379 S.W.3d at 16. Therefore, we hold that the trial court did not clearly err in finding that Erskin failed to prove a material change of circumstances to justify a modification of custody of J.S. and that a modification was not in J.S.'s best interest.

---

[3]The parties attended three custody hearings, all initiated by Erskin, in fifteen months.

[4]Erskin argues that Berry was upset with Erskin and her counsel when Erskin told Vantage Point that she needed a pass to check out J.S. from treatment because the trial court requested his attendance at the emergency custody hearing in June 2014. The trial court did not make this request.

Erskin next argues that the trial court erred in denying her motion for contempt. She argues that the trial court's October 2013 order required Stout to effectuate all paperwork necessary to allow her access to J.S.'s medical and educational information and that he failed to do so. She testified that she was unable to get copies of J.S.'s medical records or make appointments for him and that she did not have copies of J.S.'s Medicaid or ARKids insurance cards. Erskin's sister also testified that Erskin was unable to make appointments for her son. Erskin points out that Stout did not sign the authorization for her to get J.S.'s school records until August 2014.

In order to establish contempt, there must be willful disobedience of a valid order of a court. *Kilman v. Kennard*, 2011 Ark. App. 454, at 7, 384 S.W.3d 647, 651. Contempt is a matter between the court and the litigant and not between the two opposing litigants. *Id.*, 384 S.W.3d at 651–52. Before one can be held in contempt for violating the court's order, the order must be definite in its terms, clear as to what duties it imposes, and express in its commands. *Id.*, 384 S.W.3d at 652. This case involves civil contempt. Civil contempt protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. *Id.*, 384 S.W.3d at 652. The standard of review for civil contempt is whether the finding of the trial court is clearly against the preponderance of the evidence. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 449, 156 S.W.3d 228, 235 (2004).

We hold that the trial court's denial of Erskin's motion for contempt is not clearly against the preponderance of the evidence. While Stout may have failed to properly and/or timely fill out medical or educational paperwork giving Erskin access to J.S.'s records, treatment, or

SLIP OPINION

education, there was a complete lack of evidence that his omission was willful. Further, there is no evidence that Erskin was prejudiced or suffered as a result of his omission. She failed to present any evidence that she was denied access to J.S.'s educational records or activities. And the evidence that was presented showed that she was not denied access to J.S.'s medical information or treatment. For example, Erskin was able to take J.S.—on her own—to Northwest Medical without the insurance cards. She was present when J.S. was admitted at Vantage Point, and she did not testify that she asked for authorization at that time. Stout said that he provided her contact information to Vantage Point. Also, Erskin was aware and involved in J.S.'s treatment at Vantage Point. She visited him every Sunday during his eight-week stay. And she checked him out of the facility twice. Malisa Stout testified that she handed Erskin J.S.'s Vantage Point discharge papers. Based on this evidence, we hold that the trial court's denial of Erskin's motion for contempt was not clearly against the preponderance of the evidence.

For her final argument, Erskin argues that the trial court erred as a matter of law in ordering her to pay Stout's attorney's fees. She cites the Social Security Act, 42 U.S.C. § 407(a) (1998), which provides that none of the moneys paid or payable or rights existing under the Act shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or solvency law. Based on this statute, she argues that "the trial court stepped outside the bounds of state law when it levied [attorney's fees] against [her] income, which is solely acquired from her Social Security disability income."

There is no merit to Erskin's argument. The trial court's order assessing attorney's fees is a judgment against Erskin—not a levy or garnishment of her benefits. A judgment has been

defined as "[a] court's final determination of the rights and obligations of the parties in a case." *Black's Law Dictionary* 918 (9th ed. 2009). A garnishment has been defined as a proceeding whereby a plaintiff seeks to subject to his claim property of the defendant in the hands of a third person or money owed by such person to the defendant, and it may be issued at whatever stage of a proceeding the statutes may authorize. *Sharum v. Dodson*, 264 Ark. 57, 61, 568 S.W.2d 503, 505 (1978). A garnishment is a method of executing a judgment. Because the order/judgment assessing attorney's fees against Erskin has no effect on her Social Security benefits, we hold that 42 U.S.C. § 407(a) has no application to this case. Accordingly, we affirm the trial court's award of attorney's fees to Stout.

Affirmed.

VIRDEN and GLOVER, JJ., agree.

*Elizabeth J. Finocchi*, for appellant.

*White and Ruff Law Offices*, by: *Lauren E. Ruff*, for appellee.